IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JESSIE J. G.[1]                          )
                                         )
                   Plaintiff,            )
                                         )
vs.                                      )        Case No. 17-cv-01324-CJP[2]
                                         )
COMMISSIONER OF SOCIAL                   )
SECURITY,                                )
                                         )
                   Defendant.            )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Jessie J. G. (Plaintiff) seeks

judicial review of the final agency decision denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits

pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI on June 11, 2014, alleging a disability

onset date of January 15, 2013. (Tr. 158-70). His applications were denied at

the initial level (Tr. 67-76) and again upon reconsideration (Tr. 80-105). Plaintiff

requested an evidentiary hearing, which Administrative Law Judge ("ALJ")

Christina Y. Mein conducted on July 11, 2016. (Tr. 37-60). ALJ Mein issued an

unfavorable decision on October 31, 2016. (Tr. 12-36). The Appeals Council

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect
his privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties
pursuant to 28 U.S.C. § 636(c). See Doc. 22.

denied Plaintiff's request for review, (Tr. 1-6), rendering the ALJ's decision the final agency decision. Plaintiff exhausted all his administrative remedies and filed a timely Complaint in this Court. (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff argues the ALJ failed to properly consider the medical opinions and a third-party function report.

## Applicable Legal Standards

To qualify for SSI or DIB, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically

be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The ALJ's Decision

ALJ Mein determined Plaintiff met the insured status requirements through March 31, 2016 and had not engaged in substantial gainful activity since January 15, 2013, the alleged onset date. (Tr. 17). Plaintiff had severe impairments of anxiety disorder, depression, and panic disorder. These impairments did not meet or equal a Listing. The ALJ determined Plaintiff had the RFC to perform a full range of work at all exertional levels but was limited to performing simple, routine, and repetitive tasks with no interaction with the public and only occasional interactions with coworkers and supervisors. (Tr. 21-22). Plaintiff was unable to perform any past relevant work, but other jobs existed in significant numbers in the national economy that he could perform. The ALJ found Plaintiff not disabled. (Tr. 30-31).

### The Evidentiary Record

The following summary is directed at Plaintiff's arguments.

### 1. Agency Forms

In his initial agency forms, Plaintiff alleged that anxiety, panic attacks, shortness of breath, and depression limited his ability to work. (Tr. 184). Plaintiff had an eighth-grade education and previously worked as a carpenter and in the concrete business. (Tr. 185). At the time of his application, Plaintiff was self-employed as a general laborer, netting approximately $250 per month. (Tr. 202). Plaintiff took Klonopin, Lorazepam, Paxel, and Vitamin D for his conditions. (Tr. 186).

Plaintiff lived with his two children. On an average day, Plaintiff woke up and moved around "as much as possible" to overcome dizzy spells. He drove because his therapist told him it would help with panic attacks. Plaintiff took care of his children. He cooked, washed laundry, and drove his daughter to cheerleading practice. He also fed and watered his pet and played "ball" with it. Plaintiff was able to cook almost anything and he prepared meals daily. Plaintiff was able to clean, wash laundry, and perform home repairs, albeit slowly. He mowed the lawn to try to "get better." Plaintiff grocery shopped but sometimes felt like he could not breathe if he was in the store for too long. He visited his children's grandparents and his brother on most days. (Tr. 205-09).

Plaintiff got dizzy and panicked if he was around more than five other people. (Tr. 210). If he walked too long or climbed stairs, he felt like he could not breath. Lifting made him dizzy and sometimes cloudy. Talking on the phone

also made him cloudy.  He could walk about a block before needing to stop and rest.  (Tr. 210).

Plaintiff's brother, Geronimo, completed a third-party function report on August 11, 2014.  He corroborated Plaintiff's allegations.  (Tr. 230-37).

### 2. Evidentiary Hearing

Plaintiff testified at an evidentiary hearing, at which he was not represented by counsel.  He stated he tried to drive every day, as part of his therapy.  He was instructed to drive for 15 miles each day.  When Plaintiff got in his truck, he could hardly breath and everything seemed like it started to close in.  He drove to the hearing, which was approximately 20 miles away.  For an entire year, Plaintiff was in his house and could not leave because of his symptoms.  He became claustrophobic around crowds of people of 10 or more people.  On a typical day, Plaintiff woke up, watched television, went outside, and talked to neighbors or relatives so that he could "try and get [himself] back into talking to crowds. . ." He went grocery shopping about once a week. (Tr. 40-57).

### 3. Medical Records

Plaintiff presented to the emergency room on February 8, 2013 with complaints of an anxiety attack.  He reported a history of feeling like he was going to pass out.  Plaintiff was positive for shortness of breath and generalized weakness.  Plaintiff's psychiatric affect was normal and he was awake and alert on neurologic exam.  His behavior was appropriate and he interacted normally with

care givers. An electrocardiogram was normal and demonstrated no evidence of acute ischemia or injury. An image of Plaintiff's chest showed minimal linear infiltrate at the right lung base Plaintiff was diagnosed with acute anxiety. (Tr. 311-36).

Plaintiff presented to physician assistant ("PA") Edward Carl Anderson on February 12, 2013. He said he received Lorazepam at the emergency room for his anxiety and panic attack and it made him drowsy and nonfunctional. He was stressed out and very hyper, but focused. PA Anderson started Plaintiff on Zoloft and noted that Plaintiff hated taking pills. (Tr. 377-78).

Plaintiff followed up with PA Anderson on March 29, 2013. He had been taking BuSpar, which helped a "little" but he could not tolerate Zoloft or Paxil. PA Anderson increased Plaintiff's BuSpar, started him on Vistaril, and referred him to a counselor. (Tr. 375-76).

Plaintiff saw PA Anderson on April 10, 2013 and said he was not taking his paroxetine because the first listed side effect was anxiety. PA Anderson advised Plaintiff to take his paroxetine and follow up with a counselor. (Tr. 355-56).

Plaintiff began seeing counselor Autumn Molinari on April 25, 2013. He reported low interest and difficulty concentrating. He had anxiety and panic symptoms and felt discouraged. He had a severe panic attack in January 2013 and felt increased anxiety ever since. Plaintiff was alert and oriented. His speech was within normal limits and he had no psychomotor abnormalities. His mood was anxious. Plaintiff's affect was appropriate to content and his thought

processes were intact, logical, linear, and goal directed. Plaintiff's judgment and insight were fair. Ms. Molinari diagnosed Plaintiff with anxiety disorder and included an Axis IV diagnosis of "social environment and occupational." His Global Assessment of Functioning ("GAF") score was 50.[4] Ms. Molinari instructed him to return in two weeks and utilize healthy coping skills. (Tr. 528). Plaintiff followed up with Ms. Molinari approximately every two weeks through December 2013.

On May 7, 2013, Plaintiff told Ms. Molinari he had a few days where he felt better and his anxiety was minimal. He experienced anxiety when trying to drive long distances away from home and his symptoms limited his ability to work. Plaintiff agreed to try to increase his distance away from home slowly. (Tr. 527).

On May 16, 2013, Plaintiff told Ms. Molinari he was having panic attacks on a daily basis and felt like nothing was helping. (Tr. 526).

On May 30, 2013, Plaintiff told Ms. Molinari he was waking up several times throughout the night due to worry. (Tr. 525).

On June 18, 2013, Plaintiff told Ms. Molinari his anxiety level was still high and he had a few days where he felt good, but it usually lasted for a short period. He still had numbness, tingling, and nausea after taking his anxiety medication. He was practicing breathing exercises, progressive muscle relaxation exercises, and changing his worry and anxious thoughts. (Tr. 524).

---

[4] A GAF score "is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (5th ed. Text revision 2000)).

Plaintiff presented to PA Anderson on July 1, 2013 and reported that the BuSpar helped him but it made him nauseous and his scalp tingle. Every time he got in a car he became anxious due to prior accidents. He planned to continue driving. He believed the counseling sessions were beneficial. (Tr. 373-74).

On July 1, 2013, Plaintiff followed up with Ms. Molinari and reported he continued to feel anxious and had physical reactions to his anxiety. He was also frustrated with his medication because he experienced negative side effects. (Tr. 511).

On July 15, 2013, Plaintiff told Ms. Molinari his mood was slightly improved, overall, and he was trying to change his diet to see if it helped with anxiety. He felt like his anxiety had slightly decreased over the past few days and he continued to work on breathing exercises and cognitive behavioral therapy techniques. He felt like those coping strategies helped at times. (Tr. 522). On July 29, 2013, Plaintiff said he was stressed. He was taking a new medication and felt like it was helping. (Tr. 521).

Plaintiff returned to PA Anderson on August 1, 2013 and reported the Klonopin was helping. It made him a little drowsy but it helped him sleep at night. He had not had a good night's rest in a long time but was less stressed. PA Anderson refilled Plaintiff's Klonopin and instructed him to follow up with his counselors. (Tr. 369-70).

On August 12, 2013, Plaintiff told Ms. Molinari his mood had improved. The medication he received from his primary care provider had been helping "a

lot" but it seemed to wear off in between doses. Plaintiff had been able to get out more and drive further on the medication. He was not experiencing side effects either. (Tr. 520).

Plaintiff saw PA Anderson on September 3, 2013 and stated he "really need[ed]" Klonopin to get through the day but he hated taking pills. PA Anderson increased Plaintiff's Klonopin and advised him to see a psychiatrist, write his thoughts out, and try to control his anxiety without pills. (Tr. 367-68).

On September 5, 2013, Plaintiff followed up with Ms. Molinari and said he was stressed. He continued to feel anxious and frustrated that he had to take medication to help keep him calm. Plaintiff agreed to continue driving further distances and working more. (Tr. 518).

On September 19, 2013, Plaintiff told Ms. Molinari he was stressed. He was making an effort to go to work and drive longer distances and had seen some improvement. (Tr. 517).

On September 30, 2013, Plaintiff followed up with Ms. Molinari and said his mood continued to remain stressed but his anxiety level was decreased. He felt like his symptoms were more manageable. He was able to drive longer distances and had not been having panic attacks. Plaintiff did express concerns about not being able to breath at times. When he performed physical activity, he had a very hard time breathing and had to stop. (Tr. 516).

Plaintiff followed up with PA Anderson on October 8, 2013. He stated he stopped taking Klonopin for several weeks to prove to himself that he was not

addicted. Smoking a cigarette helped get rid of his chest pain and the feeling that he could not breath. PA Anderson advised Plaintiff to write down his thought and take deep slow breaths. (Tr. 365-66).

On October 15, 2013, Plaintiff told Ms. Molinari he was frustrated because his anxiety was hindering his ability to work and he had not been able to make any real money. Plaintiff was afraid he would have a panic attack on the job if he tried to work. (Tr. 515).

On October 28, 2013, Plaintiff told Ms. Molinari he was stressed and that his anxiety was not getting better. Plaintiff was going to continue to try to go back to work by managing his anxiety and changing his worry thought patterns. (Tr. 514).

On November 12, 2013, Plaintiff told Ms. Molinari his anxiety level increased over the previous week and he still had difficulty breathing much of the time. He did not feel like his medication was helping as much as before. (Tr. 513).

Plaintiff told Ms. Molinari on November 26, 2913 that his anxiety had worsened and he had difficulty breathing. (Tr. 512).

On December 10, 2013, Plaintiff reported stress about financial issues to Ms. Molinari. His new psychiatrist prescribed him Paxil but he was hesitant to try it because of side effects. He agreed to try the medication to see if it helped with his anxiety and enabled him to return to work. (Tr. 511).

Plaintiff followed-up with PA Anderson on December 23, 2013. He reported that another doctor put him on paroxetine, but he was hesitant to take it. Chamomile tea helped him calm down. He tried to cut back on Klonopin and sometimes skipped it altogether. PA Anderson advised Plaintiff to take his paroxetine and keep his appointments with his counselor. (Tr. 361-62).

On December 24, 2013, Plaintiff told Ms. Molinari he had been doing well over the past few days up until the previous night. He had not been experiencing as much anxiety but felt very panicky the night before and became overheated and felt disoriented. (Tr. 510).

Plaintiff saw PA Anderson on March 7, 2014 for a follow-up and reported his anxiety was worse. He sometimes just took one of his Klonopin, sometimes skipped taking it during the day, and sometimes took a half of a tablet instead of a whole. On exam, he was alert and oriented and in no acute distress. (Tr. 357-58).

Plaintiff returned to PA Anderson on July 23, 2014 and complained there was something wrong with his lungs. He said he could not work because he could not be around heavy equipment; he got so anxious that he believed he would pass out. He had talked to counselors but could not work past his anxiety. Plaintiff was alert and oriented and his lungs were clear to auscultation. PA Anderson assessed Plaintiff with insomnia, anxiety, depression, and panic disorder. They discussed medication and breathing exercises. Plaintiff said he hated taking pills because they made him drowsy. He took one Klonopin at bedtime. After much

discussion, Plaintiff agreed to take a low dose of Paxil and Zantac a couple of hours before bedtime. PA Anderson advised Plaintiff to write his thoughts down and talk to a counselor. (Tr. 351-52).

Plaintiff returned to Ms. Molinari on August 4, 2014. He was experiencing low interest and difficulty concentrating. He had not been to therapy for over seven months but returned because his anxiety symptoms had not improved. He felt frustrated that he was still not working due to anxiety. He was struggling financially. He continued to experience physical reactions from his anxiety, including panic attacks and difficulty breathing. He became very anxious when he grocery shopped or was around a large group of people. Plaintiff was alert and oriented. His speech was within normal limits and he had no psychomotor abnormalities. His mood was stressed and anxious. Plaintiff's affect was appropriate to content and his thought processes were intact, logical, linear, and goal directed. Plaintiff's thought content was appropriate and his judgment and insight were fair. Ms. Molinari diagnosed Plaintiff with anxiety disorder and instructed him to return in two weeks and utilize healthy coping skills. (Tr. 509).

Plaintiff saw PA Anderson on August 27, 2014. Pa Anderson "reinforced [Plaintiff's] excellent use of his Klonopin and trying to cut back as much as possible. . ." (Tr. 452-53).

Plaintiff saw Ms. Molinari on September 2, 2014 and said he struggled with panic symptoms daily, including difficulty breathing and dizziness. Those symptoms occurred while he was driving and worsened with physical activity. He

felt discouraged and frustrated because his anxiety caused him to lose his livelihood. He was struggling financially because he could not work. When he tried to work, he had to take breaks due to breathing problems and dizziness. Ms. Molinari suggested Plaintiff undergo an evaluation for medication. (Tr. 508).

On September 15, 2014, Plaintiff said he had been "down" and anxious. His cousin passed away and he was trying to work through his grief. His anxiety level had been very high and several situations the previous weekend triggered panic symptoms, including driving, being around family, and going grocery shopping. He had a hard time breathing, was dizzy, and had to sit down to rest before continuing any activity. These same symptoms manifested when he tried to perform any physical activity. (Tr. 507).

On September 29, 2014, Plaintiff told Ms. Molinari that he continued to struggle with daily anxiety symptoms. He had severe panic attacks the day prior to his appointment and woke up that morning still felling some physical affects. Ms. Molinari suggested Plaintiff undergo an evaluation by a psychiatrist but Plaintiff was resistant because he did not want to take medication. (Tr. 506).

Plaintiff followed up with PA Anderson on October 2, 2014 and said he was afraid of taking Paxil. Plaintiff was nervous to get in vehicles but was "working on it." He was using Klonopin sparingly. PA Anderson advised Plaintiff to take deep breaths, relax, and follow up with his counselor. (Tr. 450-51).

State agency consultant Dr. Harry Deppe conducted a psychological exam of Plaintiff on October 14, 2014. Plaintiff reported he was recently prescribed

Klonopin for anxiety. He used to get very nervous and was unable to tolerate being around a lot of people but was doing better. He could get out of the house a bit more, go shopping, and take his kids to school. He described his sleep as fair to good and his appetite was within normal limits. Plaintiff had friends. He appeared to be functioning at an approximate average level of intellectual ability. On mental status exam, Plaintiff's mood and affect were within normal limits and Dr. Deppe did not note any symptoms of anxiety or formal though disorders. Plaintiff's facial expressions and body mannerisms were appropriate, he had no difficulty staying focused, his responses to questions and comments were relevant and coherent, and he was oriented to time, place, and person. Plaintiff's simple reasoning skills were good, his abstract reasoning skills were within the normal limits, and his judgment and insight were adequate. Plaintiff said his daily activities included shopping, taking care of his children, driving his children to school, cooking, cleaning, washing laundry, and occasionally working on cars for other people. He did yard work. Plaintiff appeared capable of functioning independently and his ability to complete tasks in a timely and efficient manner appeared adequate. Dr. Deppe diagnosed Plaintiff with panic attacks, in remission. (Tr. 4 15-18).

Plaintiff also presented to state-agency consultant Dr. Adrian Feinerman on October 14, 2014. Plaintiff complained of panic attacks since January 2013. He had blacked out and experienced chest pain, dizziness, and light headedness. Those episodes occurred daily and lasted about five minutes to three hours. On

mental status exam, Plaintiff was oriented to person, place, and time. His appearance, behavior, memory, concentration, and ability to relate were normal. Dr. Deppe's diagnostic impression was "normal male." (Tr. 420-26).

On October 17, 2014, state agency consultant Dr. Donald Henson opined Plaintiff had mild restrictions of activities of daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. Dr. Henson categorized Plaintiff's anxiety condition as non-severe. (Tr. 65-67).

On October 20, 2014, Plaintiff told Ms. Molinari he had been frustrated and stressed. He experienced anxiety and panic symptoms on a daily basis. He tried to work but always experienced panic symptoms such as dizziness and difficulty breathing. (Tr. 505).

On November 3, 2014, Plaintiff followed up with Ms. Molinari. He had attempted to do some physical labor but it was very challenging because he experienced difficulty breathing and light headedness. He continued to push himself but tasks that used to take him a short amount of time took him several days. (Tr. 504).

Plaintiff returned to PA Anderson on November 6, 2014 and said he was very anxious. PA Anderson refilled Plaintif's Klonopin. (Tr. 448-49).

Plaintiff saw Ms. Molinari on December 22, 2014 and reported increased anxiety and panic symptoms that interfered with his ability to work. His symptoms included sleep disturbances, muscle tension, decreased effectiveness

and productivity, palpitations, headaches, and shortness of breath. His mood had been discouraged and frustrated. He tried to work and it did not go well. He was on a job site for three days and every day he became dizzy and short of breath. He did not feel anxious on the job but became anxious when he could not breathe. (Tr. 467-69).

Plaintiff saw Ms. Molinari on January 5, 2015 and reported increased anxiety and panic symptoms. His mood had been mildly stressed due to his financial situation. He experienced frustration with his dizzy spells and breathing problems. He struggled to find work on a daily basis because of those issues. (Tr. 470-72).

Plaintiff presented to Ms. Molinari on January 20, 2015 and reported increased anxiety and panic symptoms. His mood was slightly improved since his last visit. His dizzy spells and light headedness decreased and he felt like he could breath better. He still experienced moments where he had trouble breathing but felt his symptoms were somewhat improved. (Tr. 473-75).

Plaintiff saw Ms. Molinari on February 3, 2015 and reported his mood had been anxious and stressed due to a situation with his teenage son. (Tr. 476-78).

Plaintiff returned to Ms. Molinari on February 19, 2015 and reported he was stressed because his friend was recently hospitalized. He had several panic attacks when he attempted to go visit his friend at the hospital. (Tr. 479-82).

Plaintiff saw Ms. Molinari on March 9, 2015 and reported his mood had been "down" and anxious the previous week. His friend passed away, which made

him sad. He also felt very anxious because he had to deal with a lot of people and situations. (Tr. 484-86).

Plaintiff presented to Ms. Molinari on March 24, 2015 and said his mood had been very anxious. It was very difficult to attend his friend's funeral because there were so many people there. He became very anxious around large groups of people and while driving long distances. These limitations hindered his ability to work and complete daily activities. (Tr. 488-90).

Plaintiff returned to Ms. Molinari on April 7, 2015 and reported that his mood continued to be anxious. He felt discouraged. He attempted to go on a job site again and became anxious and dizzy and had a hard time breathing. He utilized all of the relaxation and coping skills he learned but they did not help his breathing. Plaintiff was hesitant to take medication because he was afraid of the side effects. (Tr. 491-95).

Plaintiff followed up with Ms. Molinari on April 27, 2015 and reported that he had anxiety on a daily basis. He tried to be active but struggled because of his symptoms. He had episodes where he had difficulty breathing, became dizzy, and felt "foggy." Those symptoms forced him to go back home and he experienced them no matter where he went or what the situation was. Ms. Molinari encouraged Plaintiff to continue practicing positive thinking and using the coping strategies he learned in therapy. (Tr. 496-99).

Plaintiff saw Ms. Molinari on May 14, 2015 and reported he had been more anxious than usual due to situations with his son. (Tr. 500-03).

Plaintiff presented to psychiatrist Dr. Christopher Loynd on July 8, 2015. He reported symptoms of anxiety, including sleeping only three to four hours per night, excessive worry, trouble working, nervousness, anticipatory fears, inability to control worry or relax, and panic attacks. He reported a history of panic attacks, but denied experiencing many since he stopped taking his cholesterol medications. He said he tried Paxil, BuSpar, and Visteril but did not experience many benefits. He reported benefits from Ativan and "a certain degree" of benefits with Klonopin. On mental status exam, Plaintiff was hyperactive, irritable, and anxious. Dr. Loynd diagnosed Plaintiff with generalized anxiety disorder and prescribed him Dozepin. (Tr. 551-54).

Plaintiff followed up with Dr. Loynd on August 12, 2015 and reported symptoms of anxiety. On mental status exam, Plaintiff was irritable and anxious. He said he tried to take Doxepin but thought it was too strong and sedating. He was hesitant, but willing, to try another medication. Dr. Loynd prescribed Plaintiff Lexapro. (Tr. 547-50).

Plaintiff saw Dr. Loynd on September 25, 2015 and reported symptoms of anxiety. He tried Lexapro but had suicidal thoughts so he discontinued taking it. He was not interested in taking any medication. Plaintiff said he did not experience any relief from his symptoms, but therapy was helping a "bit." He stopped taking Klonopin as well. Plaintiff was selling his belongings because he was unable to work. He was also experiencing obsessive thoughts. Plaintiff was irritable and anxious on mental status exam. (Tr. 543-46).

Plaintiff followed up with Dr. Loynd on November 25, 2015. He said he had a hard time breathing for a few days and felt like his head was cloudy. Plaintiff had experienced events that caused him anger and anxiety. He reported excessive worry, trouble with working, anxiety/nervousness, anticipatory fears, an inability to control his worry or relax, and panic attacks. He said he was going to therapy, which helped with his symptoms, but he was not getting relief. Plaintiff reported his medication adherence at greater than 90%. He denied depressive symptoms. Plaintiff stated he could not work because of his anxiety. Every time he tried to do something physical, he had difficulty breathing and his head felt foggy. He was irritable and anxious on mental status exam but otherwise demonstrated normal findings. (Tr. 535-38).

Plaintiff saw Dr. Loynd on February 26, 2016 and said he was anxious and still having trouble breathing. He tried relaxation exercises and other coping skills but did not find them helpful. Plaintiff said his symptoms were not as bad as before and he wanted to continue working on his condition without medications. He found he was steadily but slowly improving. Therapy was helping. He slept about four or five hours a night. He was able to ride his bike and walk around without getting too anxious. (Tr. 650-52).

Plaintiff followed-up with Dr. Loynd on April 22, 2016. He was frustrated because of his breathing problems. He had tried to help someone move a television a short distance and became severely out of breath. Dr. Loynd suggested anxiety might have caused his breathing issues. (Tr. 646-49).

Dr. Loynd completed a mental RFC assessment of Plaintiff on June 8, 2016. He listed Plaintiff's diagnosis as generalized anxiety disorder. Plaintiff's highest and most current GAF score was a 30-35 and his prognosis was "poor." Plaintiff's ongoing complaints of shortness of breath contributed to his mental impairment. Plaintiff had undergone several medication trials and regular individual cognitive behavior therapy. According to Dr. Loynd, Plaintiff's impairments had lasted at least 12 months. Plaintiff was not a malingerer. He was moderately limited in his ability to maintain attention and concentration for extended periods. He was markedly limited in his ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to otherwise without being distracted; complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisions; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. Dr. Loynd indicated he did not evaluate how

patients remembered locations, procedures, or instructions, so he was unable to answer whether Plaintiff could remember locations and work-like procedures; understand and remember short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; or carry out detailed instructions. Dr. Loynd state, "The patient's generalized anxiety disorder has prevented him from leaving his house and socializing appropriately enough to be able to maintain any employment. He sincerely has the desire to work but he honestly is unable to due to emotional condition. We have tried several meds and other treatment modalities, but he remains refractory with a poor prognosis. He also has had several intolerant side effects to meds which further complicates future improvement." (Tr. 561-68). Dr. Loynd further explained, "The Patient's symptoms prevent him from leaving his home regularly or socializing well with others, with prevent any gainful employment at this time." (Tr. 564).

Plaintiff presented to the emergency room on July 8, 2016 with complaints of shortness of breath. He was diagnosed with asthma with acute exacerbation and anxiety reaction. (Tr. 575-85).

## Analysis

Plaintiff argues the ALJ failed to properly consider the opinion of his treating psychiatrist, Dr. Loynd, who found Plaintiff was moderately and markedly limited in several areas of functioning. Dr. Loynd also opined Plaintiff's inability to interact well with others or drive long distances precluded

him from maintaining employment. The ALJ gave Dr. Loynd's opinion "little weight" because it was inconsistent with other treatment records and Plaintiff's own allegations. (Tr. 28-29). For the reasons set forth below, this evaluation was erroneous.

The Social Security Regulations require an ALJ to afford controlling weight to a treating source's opinion, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527. Otherwise, the ALJ must identify "good reasons" for rejecting the opinion and assess it against the following factors: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; and (5) the physician's specialization. *Id.*

Here, the ALJ discredited Dr. Loynd's opinion because Plaintiff admitted he took his children to school, grocery shopped, visited neighbors, and attended doctor appointments, which supposedly contradicted "Dr. Loynd's statement that the claimant is unable to leave the house." The ALJ's assessment was erroneous for several reasons. As an initial matter, the ALJ mischaracterized Dr. Loynd's opinion. Dr. Loynd stated, "The patient's generalized anxiety disorder has prevented him from leaving his house and socializing *appropriately enough to be able to maintain any employment*." Dr. Loynd further stated, "The patients' symptoms prevent him from leaving his home *regularly* or socializing *well* with

others, which prevent any gainful employment at this time." (Tr. 558, 564) (emphasis added). Dr. Loynd never indicated that Plaintiff was totally incapable of leaving his home or being around others, as the ALJ's opinion suggests. Besides, the Seventh Circuit has cautioned ALJs not to put too much weight on a claimant's activities of daily living because "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Moreover, the record is riddled with instances where Plaintiff expressed a fear of driving and social interactions, but the ALJ did not mention this evidence when evaluating Dr. Loynd's opinion.[5] An ALJ cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The alleged inconsistency between Plaintiff's activities of daily living and Dr. Loynd's opinion does not constitute good evidence to disregard the treating source's opinion.

The ALJ also discredited Dr. Loynd's opinion because Plaintiff stated he could follow written and spoken instructions "good" and was able to handle stress "okay," which is inconsistent with the "significant limitations" Dr. Loynd imposed

---

[5] (May 7, 2013: Plaintiff told his counselor he had anxiety when he tried to drive long distances. (Tr. 527); July 1, 2013: Plaintiff told his PA that every time he got in a car he became anxious. (Tr. 373-74); September 15, 2013: Plaintiff told his counselor his anxiety was very high because he had to go grocery shopping, spend time with family, and drive. (Tr. 507); October 2, 2014: Plaintiff told his PA he was nervous to get into vehicles but was "working on it." (Tr. 450-51); March 9, 2015: Plaintiff told his counselor he was anxious when he had to be around large groups of people or drive long distances. (Tr. 488-90); April 27, 2015: Plaintiff told his counselor that his symptoms of anxiety forced him to return home. (Tr. 469-99)).

on Plaintiff. The ALJ, however, did not point to the inconsistent limitations that Dr. Loynd apparently found, so the Court cannot review this portion of the ALJ's determination. The Seventh Circuit has "repeatedly stated . . . that an ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability.'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The ALJ cannot make general assertions that a treating source opinion is inconsistent with portions of the record without identifying those inconsistencies. This line of the ALJ's reasoning was also erroneous.

The ALJ next noted, "[T]he cause for the claimant not taking his medications as prescribed has not always been due to his allergic reactions. He reported on numerous occasions that he just does not like taking medication." (Tr. 29). It is unclear why the ALJ made this observation; Dr. Loynd never rendered a contradictory opinion. Dr. Loynd merely stated that Plaintiff "also has had several intolerant side effects to meds which further complicates future improvement." (Tr. 558). The ALJ failed to build a logical bridge between the evidence and her conclusion.

Finally, the ALJ noted that Dr. Loynd reported GAF scores for Plaintiff that were lower than the GAF scores other providers reported. However, ALJ Mein also recognized that GAF scores may vary "day to day and practitioner to practitioner" and lack "reliability, validity, and subjective interpretation." The ALJ's reasoning is simply not logical. The ALJ cannot fault Dr. Loynd for reporting a GAF score that was different than other GAF scores in the record,

while simultaneously explaining away the inconsistency. Any discrepancy in GAF scores does not undermine Dr. Loynd's opinion. (Tr. 29).

In addition to the above errors, the ALJ also failed to determine what weight to assign Dr. Loynd's opinion in accordance with the regulations. As previously explained, an ALJ must first determine whether the treating source's opinion is entitled to controlling weight in consideration of supportability and consistency with the record. If the ALJ finds the opinion is lacking in either of these aspects, the ALJ must proceed to step two, where he applies the checklist of factors articulated in 20 C.F.R. § 404.1527. The ALJ uses these factors to determine exactly what weight to assign to the opinion. This process consists of two "separate and distinct steps." *Williams v. Berryhill*, 2018 WL 264201, at \*3 (N.D. Ill. Jan. 2, 2018). The ALJ, here, conflated these steps and there is no indication she even considered the regulatory factors.

In sum, the ALJ's evaluation of Dr. Loynd's opinion was erroneous for multiple reasons, so the disability determination must be remanded. Because remand is warranted on this point, alone, the Court will not address Plaintiff's remaining arguments.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATE:**      **October 29, 2018.**


                                  **s/ Clifford J. Proud**
                                  **CLIFFORD J. PROUD**
                                  **UNITED STATES MAGISTRATE JUDGE**